## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
## CHATTANOOGA

| | | |
|---|---|---|
| THOMAS WILLIAM MORGAN, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | No 1:24-cv-00303-TRM-MJD |
| ~v~ | § | |
| | § | |
| MARION COUNTY GOVERNMENT, | § | JURY DEMAND |
| | § | |
| LINDA MASON, | § | |
| | § | |
| RONNIE "BO" BURNETTE, and | § | |
| | § | |
| DALE WINTERS, | § | |
| | § | |
| *Defendants.* | § | |

## PLAINTIFF'S RESPONSE IN OPPOSITION TO THE DEFENDANTS' (JOINT) MOTION FOR SUMMARY JUDGMENT OR IN THE ALTERNATIVE MOTION TO DISMISS

Plaintiff Thomas William Morgan, through counsel, hereby submits this response to Defendants' Marion County Government ("County"), Ronnie "Bo" Burnett ("Burnett"), and Dale Winters ("Winters") jointly filed motion for summary judgment or motion to dismiss[1]. (DE 38, and DE 39 [with exhibits]).

## PRELIMINARY STATEMENT

Defendants' memorandum in support of summary judgment relies on subjective characterizations—such as "theatrics," "unfriendly exchanges," and "disruptive behavior"—rather than undisputed facts supported by the summary-judgment record. (DE

---

[1] While the Defendants titled their memorandum of law as supporting their motion for summary judgment or in the alternative, motion to dismiss (DE 39, PageID #: 144), the actual motion is titled as a motion for summary judgment only with no reference to FED. R. CIV. P., Rule 12(b)(6). (DE 38). However, the Defendants do claim that Plaintiff's Count Six (civil conspiracy) must be dismissed pursuant to FED. R. CIV. P. Rule 12(b)(6) in the body of their brief. (DE 39, PageID #: 162).

39, PageID #144–48). These descriptors are not facts; they are interpretations. Whether Plaintiff's conduct was disruptive, whether Defendant Linda Mason acted out of viewpoint disagreement, and whether law-enforcement intervention was justified are classic questions of fact reserved for a jury.

Defendants concede that video evidence exists of the events at issue yet urge the Court to discount reasonable interpretations of that evidence in favor of Defendants' preferred narrative. (DE 39, PageID #144). To be sure, the Defendants rely on after-the-fact rationalizations contradicted by video evidence, minutes and agendas, sworn testimony, and their own deposition testimony. That approach conflicts with settled Sixth Circuit law wherein where video evidence may reasonably be interpreted in more than one way, the Court must construe the facts in the light most favorable to the non-moving party. See Guptill v. City of Chattanooga, No. 24-5688, 2025 WL 3295395, at *3 (6th Cir. Nov. 26, 2025) (citing Latits v. Phillips, 878 F.3d 541, 547 (6th Cir. 2017)). Only where video evidence "blatantly contradicts" the non-movant's account may the Court disregard it. See Scott v. Harris, 550 U.S. 372, 379 (2007). That is not the case here.

The video excerpts included in the Joint Appendix and Plaintiff's Addendum, together with sworn deposition testimony and official meeting documents, establish numerous genuine disputes of material fact concerning Defendants' motives, the existence (or non-existence) of neutral rules, and the lawfulness of Plaintiff's removal and subsequent treatment. Summary judgment must therefore be denied.

## PROCEDURAL BACKGROUND

Defendants filed their Motion for Summary Judgment (DE 38) supported by a memorandum (DE 39), a Joint Appendix (DE 39-1) and related exhibits (DE 39-2 through

39-12). Although Defendants styled their memorandum as supporting "summary judgment or, in the alternative, a motion to dismiss," the operative motion seeks summary judgment only and does not invoke Rule 12(b)(6). (DE 38). Plaintiff responds accordingly under Rule 56 and this Court's summary-judgment practices and will reply to the Defendant's imbedded assertion of a motion to dismiss under FED. R. CIV. P., Rule 12(b)(6).

## STANDARDS OF REVIEW

### Motion for Summary Judgment.

Summary judgment is proper when no genuine dispute of material fact exists, and the moving party is entitled to judgment as a matter of law. See FED. R. CIV. P., Rule 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The central issue before this Court is whether the evidence presents sufficient disagreement to require submission of Plaintiff's claims to a jury or whether the evidence is so one-sided that the moving party must prevail as a matter of law. See id. at 251–52.

When the movant establishes the lack of a genuine issue of material fact, the burden shifts to the non-moving party to come forward with "specific facts showing that there is a genuine issue for trial." Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986) (quoting FED. R. CIV. P., Rule 56(e)). The court must view all evidence and make all inferences in the light most favorable to the Plaintiff as the non-moving party. See Fisher v. Nissan N. Am., Inc., 951 F.3d 409, 416 (6th Cir. 2020).

But where videos in the record "show facts so clearly that a reasonable jury could view those facts in only one way," a court must view the facts in the light depicted by the

~ 3 ~

videos. <u>Guptill v. City of Chattanooga, Tennessee</u>, at *3 (6th Cir. Nov. 26, 2025) (quoting

<u>Latits v. Phillips</u>, 878 F.3d 541, 547 (6th Cir. 2017)). If the facts shown in the videos can

be interpreted in multiple ways, the facts should be interpreted in the light most favorable

to the nonmoving party. <u>Id</u>.

## Motion to Dismiss.

While the Defendants' motion (DE 38) seeks dismissal only pursuant to FED. R. CIV.

P., Rule 56, the Defendants invoked FED. R. CIV. P., Rule 12(b)(6) in one paragraph of

their brief. (DE 39, PageID #: 162). Consequently, Plaintiff will cite the applicable

standards regarding a motion to dismiss for failure to state a claim.

When entertaining a defendant's motion to dismiss under FED. R. CIV. P., Rule

12(b)(6), a court must accept the plaintiff's well-pled factual allegations as true and draw

all reasonable inferences in their favor. <u>See Doe v. Baum</u>, 903 F.3d 575, 580–81 (6th Cir.

2018) (citations omitted). Having accepted a plaintiff's factual allegations as true and

drawn all reasonable inferences in their favor, "[i]f it is at all plausible (beyond a wing and

a prayer) that a plaintiff would succeed if he proved everything in his complaint, the case

proceeds. <u>Id.</u> Moreover, "[a] motion to dismiss for failure to state a claim is disfavored,

especially when one's civil rights are at stake." <u>McGlone v. Bell</u>, 681 F.3d 718, 728 (6th

Cir. 2012) (citation omitted). Indeed, it is well documented in civil rights jurisprudence

that motions to dismiss are to be ***carefully* scrutinized** and only granted in extreme

circumstances. <u>See e.g. Lillard v. Shelby County Bd. of Educ.</u>, 76 F.3d 716, 724 (6th Cir.

1996) (motions to dismiss civil rights complaints should be "scrutinized with special care");

<u>Thurmond v. Cty. of Wayne</u>, 447 F. App'x 643, 653 (6th Cir. 2011) ("Dismissals of actions

brought under the civil rights statutes are scrutinized with special care.").

## STATEMENT OF FACTS

At the time of the events alleged in the Complaint, Mason was the commission chairperson, Burnett was the elected sheriff, and Winters was employed as a police officer. (<u>Compare</u> DE 1, PageID#: 3, ¶ 13, <u>with</u> DE 12, PageID #: 65, ¶ 13). The County commission ("commission") patterns meetings pursuant to the Robert's Rule of Order. (County Response to Interr. 27, at Pg.2). The commission chairperson presides over the meetings and topics covered are identified on a meeting agenda. (Id.).

Mason was a POST certified police officer for the Town of Jasper from 1997 to 2013. (Mason Dep. 14-15). While a police officer she had no specific training on the First Amendment and could not recall any training on the topic. (Id. at 17-18). Mason could not recall training on the Fourth Amendment beyond "just some verbatim talk about." (Id. at 18). She could not recall what the Fourteenth Amendment was nor could she recall any training on that amendment. (Id. at 18-19). Mason did not know what that the terms "prior restraints on free speech," and "due process of law" meant. (Id. at 19).

Mason had limited knowledge of the Robert's Rules of Order. (Mason Dep., at 39-40). Her knowledge was confined to "an agenda set forth," and the meetings "kept orderly." (Id. at 39). Mason was a "brand-new" commissioner and did not know how to conduct a meeting. (Id. at 59). If Mason had any questions, she would refer to Billy Gallagher[2]. (Id. at 39-40).

Mason testified that prior to assuming the role as chairperson of the commission, she had no experience or training in managing public comments at government meetings,

---

[2] Billy Gallagher (the county attorney) (Mason Dep. at 21-23)

stating directly, "None." (Mason Dep. at 19). Additionally, she stated that, as far as she knew, no person who gets elected as a county commissioner receives training on the rights of citizens to address the county commission, nor any training as to what the First Amendment, Fourth Amendment, or Fourteenth Amendment to the U.S. Constitution means. (Id.). She further specified there is "no training" for commissioners regarding these constitutional issues or meeting protocol involving public comments. (Id)

Mason stated that no specific training was provided by Marion County or anyone involved with the Marion County government about the rights of persons to address or interact with the commission at public meetings. (Mason Dep. at 32). When asked whether Marion County as a whole provides any guidance or training regarding the rights of the public, she replied, "No." (Id. at 91-92).

The agendas for commission meetings do not appear to be *determined* by anyone prior to the meeting. (Mason Dep. at 21-23). Three people *review* the agenda a week prior to the meeting[3], David Jackson (the County Mayor), Billy Gallagher (the county attorney), and the chairperson of the commission. (Id. at 21) The agenda gets set and advertised 48 hours on the County website prior to the meeting. (Id. at 21-22). Anyone who wants to be on the agenda sends a request with a topic to the County Mayor (Id. at 22).

There are two agendas in play in this matter. The first agenda addressed the January 29, 2024 meeting that contained a public comment portion. (DE 39-6, PageID #: 280). The second one was for the June 24, 2024 meeting that contained a public comment portion and an admonition that the public comments must pertain to an agenda item. (DE

---

[3] (Mason Dep., at 23).

39-7, PageID #: 281). Notice of time limits to speak whether during public comments or on agenda items are absent on these two documents. (Id[s].).

Jackson and Gallagher told Mason to make the change on the agenda to the public comments from the January 2024 meeting and the June 2024 meeting. (Mason Dep, at 30). Mason agreed that all anyone looking at the agenda for the January 2024 would see is a public comment section. (Id. at 30-31). A person would not have prior notice (before arriving at or participating in the January 2024 meeting) that their speech during public comment was limited to agenda topics, as this restriction was neither published on the agenda nor otherwise advertised in advance. (Id. at 30-31, 47, 64, and 70).

People who are addressing the commission would primarily know they need to speak from a microphone during commission meetings because they are typically requested to do so by the chairperson. (Mason Dep. at 32). Mason testified that people are required to come to the microphone because otherwise "you can't hear," and using the mic allows the recorder to get their name and ensures that people can be heard clearly by the commission and on the record. (Id. at 32, and 66). However, Mason did not provide any evidence that this requirement is posted, published, or otherwise conveyed to the public prior to walking into a commission meeting. (Id. at 32, and 66). When Mason was specifically asked how someone would know, before entering the meeting, that they needed to go to the mic, she responded, "A lot of times they're requested to go to the mic," and when asked who makes this request, she answered, "That would be the chairman." (Id. at 32).

Furthermore, Mason acknowledged that while addressing Mr. Morgan, she told him he needed to go to the mic, but did not explain that this was due to an inability to hear

him clearly; she simply stated, "If you want to speak, you've got to go to the mic." (Mason Dep. at 66). There was no indication of any formal, written, or posted policy informing members of the public about the microphone requirement in advance. (Id. at 84).

### January 29, 2024 Commission Meeting.

Donald Leonard was on the agenda to speak about Pull Tight Road. (DE 39-6, PageID #: 280). Specifically, all that was noted on the agenda was "17. Donald Leonard-Pull Tight Road." Also, on the agenda was "9. Update-Brow Trail Road." (Id.). There was nothing on the agenda that limited any discussion of Pull Tight Road to firearms. (Id.). Plaintiff took the opportunity to speak about the funds the commission was trying to allocate for the Brow Trail [Road]. (Pl. Interr. ¶ 9).

*January 29, 2024 Video of Commission Meeting.[4]*

| | |
|---|---|
| 1:37:12 | Commissioner Ruric Brandt asks if the presiding officer of the commission participate in any debate without first relinquishing the gavel to the vice chair? |
| 1:37:23 | Gallagher responds, "they're not supposed to under rules of order." |
| 1:37:24 | Mason states "I've never followed rules. I'm opinionated." |
| 1:49:26 | Mason points to the center of the room[5] and points to someone and said "you're up buddy," and someone addresses the commission. Mason politely tells the speaker to see someone ("David") to get on the agenda. This person is not at the microphone as the microphone is to Mason's right. |
| 1:50:27 | Mason asks if anyone else has any other comments, and someone from Mason's left asks about a website, and Mason politely tells the person the topic (website) was going to be handled in a workshop and made an |

---

[4] DE 39-1, PageID #: 172, ¶N are the videos cited here in this response. The Plaintiff will cite to the time stamps as they appear in the lower bar of the viewing screen. Any other references to the events depicted videos shall cite the actual documents submitted with this response brief.

[5] The microphone in play in this matter is located to Mason's right. 1:59:58.

agenda item. This person is not at the microphone as the microphone is to Mason's right.

| | |
|---|---|
| 1:50:51 | Plaintiff asks to speak and replies to Mason that his topic was on the agenda. Plaintiff was near the center of the room. |
| 1:50:55 | Plaintiff identified himself and states he wanted to address an issue about Pulltight Road, "the one that Donald Leonard" was speaking about. Plaintiff begins to address infrastructure funding issues and how he heard during the meeting the commissioners discussed spending 2 million dollars on building a road where there were no homes. |
| 1:51:24 | Mason interrupts Plaintiff points a finger at Plaintiff, and says, "ok buddy, look, we're not going there." |
| 1:51:29 | Plaintiff states it was his time to speak, and Mason tells Plaintiff to go to the mike and speak. Plaintiff retorts that he can speak loudly from where he was. At no time did Mason warn Plaintiff about being "disruptive." |
| 1:51:34 | Mason tells Plaintiff "then get over to the mic and speak" again while pointing. Mason further tells Plaintiff he can go to the mic or he does not speak. Plaintiff complies and takes a position at the microphone that is to Mason's right. |
| 1:51:43 | Mason says to Plaintiff, "you're talking about Pulltight Road." Mason asked to have her memory refreshed. |
| 1:51:54[6] | As Plaintiff addressed the commission, Mason interrupts says that Plaintiff bought a property next to a railroad and that he wants to complain. |
| 1:52:00 | Plaintiff asks Mason to let him speak and not speak over him. Mason talks over Plaintiff and Plaintiff points out that Mason spoke over others during the meeting. |
| 1:53:03 | Mason tells Plaintiff she can have him removed. |
| 1:53:07 | Mason addresses Burnett, asks to remove the Plaintiff and that she was not going to "argue with him." |
| 1:52:08 | Plaintiff asked if Mason was suppressing his First Amendment right in a public forum, and Mason said she was "not going to listen to it." |

---

[6] 30 seconds elapsed.

| 1:52:17 | Mason said the Pulltight Road was about firearms. Burnett approaches Plaintiff. Plaintiff responds that Mason asked him to talk about things that were on the agenda. View of Burnett partially obscured by a person. |
|---|---|
| 1:52:27-29 | Plaintiff asks Burnett if he was threatening Plaintiff under threat of arrest. Mason asks Winters to remove Plaintiff. |
| 1:52:33 | Plaintiff tells Mason that "this is a public forum." Winters comes into view, and places his hand on Plaintiff. |
| 1:52:36 | Plaintiff asks Winters if he was threatening Plaintiff under threat of arrest. |
| 1:52:42 | Donald Leonard[7] addresses the commission about Pulltight Road, and Mason replies, "and you can be next." Leonard replies, "yes ma'am." |
| 1:52:50 | Mason then says, "can you remove this man please." |
| 1:52:55 | Mason asks, "sheriff, can you remove this man?" Leonard states he can walk out. |

**What this video does NOT show is Mason asking advice from Gallagher on how to handle the situation, nor any member of the commission intervening in Mason's conduct. Nor does the video show Gallagher advising or saying anything to Mason about what she was doing.**

Burnett has been the sheriff of Marion County for 23 years. (Burnett Dep. at 6). While he was not required to be present at commission meetings, he attended them as a courtesy. (Id. at 8). He was present at the January 29, 2024 meeting. (Id.). He observed Plaintiff and described the Plaintiff's conduct at the January 29 commission meeting as loud but stated that, in his opinion, at the time he did not view the Plaintiff as acting in a threatening or disruptive manner prior to being removed. (Id. at 12).

---

[7] While not specifically identified in the video, Mason testified that the person heard here was Donald Leonard. (Mason Dep. at 74-75).

Burnett confirmed that Mason, *as chair*, requested he remove the Plaintiff from the meeting and that Burnett was acting at Mason's request, not on his own initiative. (Burnett Dep. at 11). Burnett also testified that he told the Plaintiff he needed to leave and, when asked if the Plaintiff was under arrest, clarified that he was not. (Id. at 12-13). Burnett stated that there was at most a light touch on the Plaintiff's shoulder or back and there was no use of force beyond guiding or soft hands, consistent with his department's policies on use of force. (Id. at 13). Burnett acknowledged that police officers can accomplish their mission ("look you have to go") because they are clothed in authority as a police officer. (Id. at 16). Burnett stated that police coercion was a helpful tactic to remove somebody rather than using a baton. (Id.).

Significantly, Burnett stated that he received no instruction or consultation before acting upon Mason's request (Burnett Dep. at 15), and that he was not aware of any prior instance in his 23-year tenure where anyone had been removed from a commission meeting at the request of a commission member. (Id. at 20). Burnett stated that he had attended commission meetings since 1980 and never seen anybody removed from a meeting. (Id. at 20-21). Burnett did not see anything by the Plaintiff to compel Burnett and Winters to remove Plaintiff on their own initiative. (Id. at 19). Burnett characterized Plaintiff's removal as *unusual*. (Id. at 20). He also acknowledged there were no criminal charges filed against the Plaintiff. (Id. at 21).

Burnett found Mason's comments, that she was opinionate and did not follow the rules, as something he wished she had not said. (Burnett Dep. at 24-25). Burnett did not see the Plaintiff being aggressive and disruptive at the point that Mason told Plaintiff, "look, we're not going there." (Id. at 26). Burnett believed that Mason had acted as the

initiator of the escalation and acknowledged both sides became argumentative, *but only after Mason's initial remarks*. (Id. at 28). At the point Mason directed Plaintiff's removal, Burnett did not see anything (in his view as a law enforcement officer) to justify removing Plaintiff from the meeting. (Id. at 29). He stated that, had it been up to him, he would not have removed the Plaintiff at the time he was asked to do so. (Id. at 31 and 34)

Winters was a law enforcement officer for 33 years. (Winters Dep. at 8). His understanding where citizens simply say something an officer doesn't like is not grounds to seize the person. (Id. at 42).

Winters' understanding of Mason's role at the meeting was the spokesperson for the commissioners. (Winters Dep. at 41). At the time of the meeting January 29, 2024, Mason was acting as the head of the commission. (Id. at 42). Winters believed that Mason was becoming irritated with the Plaintiff and that she did not like what she was hearing from Plaintiff. (Id. at 42-43). Plaintiff and Mason were going back and forth with each other and arguing. (Id. at 41, 48, 72, and 87). Mason instructed Winters to remove the Plaintiff. (Id. at 50, and 57).

Winters' concern at the time he removed Plaintiff was "for the safety of the people in the commission meeting along with the Plaintiff." (Winters Dep. at 59). Winters believed his authority to remove the Plaintiff came from Mason whom Winters acknowledged just did not like what Plaintiff had to say. (Id. at 61-62). Winters believed that Mason and Plaintiff were becoming angry with one another, but that he took no steps to de-escalate Mason. (Id. at 62).

Winters acknowledged that seizing someone meant detaining them, and that to detain was to "stop his movement," and that detaining someone could also mean removing

someone from a place. (Winters Dep. at 26). Winters was familiar with a continuum of force when taking someone into custody. (Id. at 27). That force level starts with verbal commands and move to soft hand techniques. (Id. at 27-28). Winters acknowledged that when an officer seeks compliance from someone by giving them verbal command, that the more officers around an individual would increase a coercive effect on an individual: "It might intimidate. It depends on the individual "hisself" and it depends on the circumstances that led up to that." (Id. at 28).

Winters stated that he did not take the Plaintiff from the commission room. (Winter's Dep. at 26). However, Winters admitted that he placed his right hand on the Plaintiff prior to removing the Plaintiff from the room. (Id. at 85). Winters further admitted that Mason directed him to remove the Plaintiff, and the Plaintiff had no choice but to leave. (Id. at 86).

The Marion County Sheriff's Office policy includes directives to deputies on verbal commands, use of soft hand control, deescalation, and verbal warnings. (Burnett Response to Request for Production, at 18-20). Verbal warnings are required before use of force when tactically feasible and not required where an officer must make split decisions. (Id. at 20). The same policy requires officers to preserve public peace. (Id. at 40).

Mason had a pattern of speaking over or rushing people off the podium even when something is on the agenda. (Pl. Interr. at 7). The County has not adopted a set of rules to the meetings. (Id.).

Plaintiff stated that Burnett touched him when removed from the commission room. (Pl. Dep. at 73 and 75; Pl. Interr. at 7). Burnett told Plaintiff, "it was time to go." (Pl. Dep. at 74). Winters approached Plaintiff and Burnett and Plaintiff told these officers

that he would leave only under threat of arrest. (Id. at 77-78). Plaintiff testified that Winters grabbed his shoulder and "not dragged me, but like 'come with me.'" (Id. at 78).

Once at the front entrance of the lobby to the exterior of the building (Pl. Dep. at 80), Winters told Plaintiff that he was "right" when Plaintiff said in the meeting "you're going to violate peoples First Amendment Rights," and that Plaintiff had a right to speak, but that he was "just trying to keep it neutral." (Id. at 79).

County Commissioner Ruric Brandt ("Brandt") called Plaintiff after the incident. (Pl. Dep. at 147). He was the only commissioner who called Plaintiff to apologize and told Plaintiff that he thought "what they did was wrong." (Id. at 148).

Since the events at the two meetings (described in detail *infra*) Plaintiff has experienced fear for his life from the police in Marion County and avoids business "at all costs" in Marion County. (Pl. Dep at 119). He has experienced nightmares, and massive knots on his shoulder and neck from sleeping in a fetal position. (Id. at 123). Plaintiff does attribute his emotional damages to a sum total of the events at the two meetings and "a sum total of all things." (Id. at 124).

### June 24, 2024 Commission Meeting.

Plaintiff was on the agenda for this meeting. (DE 39-7, PageID #: 281; Mason Dep. at 80). When asked about any time limits for persons on the agenda, Mason felt it was three minutes, "But I do not --- I have to refresh." (Mason Dep. at 82). She further stated she did not know whether speakers are advised of time limits at the time of their request to be on the agenda or when they approach the microphone, noting, "I do not know if David Jackson lets them know at the time that they request to be on the agenda. I do not know." (Id.).

Mason was unsure whether she or the court clerk, Joanie Spangler, kept time during the June 24 meeting. (Mason Dep. at 84). She also said she is not aware of any procedure or light system (such as a green/yellow/red light) used during commission meetings to signal time remaining for speakers. (Id. at 83). Mason could not recall if she or Spangler were keeping time on the Plaintiff. (Id. at 83).

Mason claimed that Plaintiff was removed from the June meeting because he spoke "after his presentation" and refused to follow instructions regarding comments to the commission. (Mason Interr. 3). Mason stated she believed Morgan was being "argumentative" and "disruptive," and testified, "That's from my memory." (Mason Dep. at 86). When asked what specific rule or policy Mr. Morgan violated, Mason stated he was "disrupting the meeting" but could not identify or articulate a specific rule or policy under Robert's Rules of Order or otherwise that he had violated. (Id. at 86-87). She confirmed that her decision to direct Mr. Morgan to stop speaking or to leave was based on her perception of disruption but again could not reference a specific rule or policy that was being violated[8]. (Id. at 86-87). Indeed, Mason stated that she did not know all the Robert's Rule of Order. (Id. at 87). Mason did not consult with anyone, including Gallagher before directing Plaintiff to leave. (Mason Dep., at 87).

Mason threatened Plaintiff with calling police on him. (Pl. Interr. 9 responses at 6-7). Mason's husband was the chief of police for the Town of Jasper, Tn. (Pl. Interr. 9 responses at 6-7; Mason Dep. at 23-24).

---

[8] Plaintiff questioned Mason about her response to interrogatory #4 (Mason Response to Interrogatories at pg. 3, Interr #4) during this portion of her deposition. (Mason Dep. at 86-97). This response lacks detail.

*June 24, 2024 Video of Commission Meeting.*[9]

| | |
|---|---|
| 0:00:06 to 0:00:45 | Plaintiff introduced himself, stated his address on Pull Tight Road, and wanted to talk about integrity. He mentioned what he saw online of a meeting and describes what he saw of how the commission responded to people addressing the commission and attacking a speaker's motive and integrity. |
| 0:00:51 | Plaintiff describes how citizens cannot get basic things like water, but the County spends money on capital improvements, including Brow Trail. |
| 0:01:00 | Plaintiff returns to the integrity issue he initially raised and speaks about two people who own large parts of property on Brow Trail. |
| 0:02:04 | Mason addresses Plaintiff's integrity issue, and Plaintiff and Mason begin a dialogue where Mason tells Plaintiff to "check" his facts "before you start accusing." The back and forth continues to 0:02:51 ……….. |
| 0:02:51 | Mason asks Plaintiff if he was making a point, Plaintiff says he was making a point, Plaintiff responds he was, and Mason says, "well then make it." |
| 0:02:56 | Plaintiff raises his voice, points at Mason, and asks: "why do you specifically keep jumping in attacking every citizen when they raise questions.." Mason then talks over Plaintiff and states, "I'm not going to argue with you. First of all, I'm going to answer two of your questions." |
| 0:03:31 | Mason then goes on to explain and when Plaintiff attempted to respond, Mason says that she was talking, and begins a long explanation of how she addressed two speakers Plaintiff referenced. |
| 0:04:03 | Mason explains about having opinions, and "that's what we're elected to have." |
| 0:04:10 | Plaintiff explains that they were elected to serve the people, and Mason tells Plaintiff that he must make a point or sit down. |
| 0:04:15 | Plaintiff states that he was disheartened that people who were elected to serve the community go on and attack them. |
| 0:04:47 | Plaintiff states that Mason does not have the decency to pay attention and Mason replies that she was texting the police. |

---

[9] DE 39-1, PageID #: 172, ¶N are the videos cited here in this response. The Plaintiff will cite to the time stamps as they appear in the lower bar of the viewing screen.

0:04:55   Plaintiff asks if Mason was calling the police department and asked "for what crime" and Mason says again that the Plaintiff needs to make a point and all he was doing was "fussing."

0:05:13   Plaintiff steps away from the microphone and a member of the commission called out to the Plaintiff and asks Plaintiff a question. Plaintiff returns to the microphone then engages in a conversation with male members of the commission without arguments.

## DISCUSSION

The Defendants make much about Winters off duty status and that the County's actions are a one-time thing. Given the strength of the evidence cited by the Plaintiff, it is not surprising that the Defendants do not want this Court to check under the hood and inspect the facts through the lens of the applicable law. Plaintiff will begin with a discussion on Winters' and color-of-law, the County and *ad hoc* policy and direct involvement by the final policy maker, deliberate indifference, an overview of qualified immunity, and wrap up with a discussion on Plaintiff's causes of action to include a discussion of waiver of arguments by the Defendants.

## WINTERS ACTED UNDER COLOR OF LAW

### *Winters as law enforcement officer.*

The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law. See Couzens v. City of Forest Park, 114 F.4th 571, 577 n.4 (6th Cir. 2024) (citations omitted). Generally, a public employee acts under color of state law while acting in his official capacity or while exercising his responsibilities pursuant to state law. See Id.

But simply because Winters claims he was off duty or acting as a private citizen misses the point[10]. "The law does not require that the Defendant be acting on behalf of the state under the state's authority." Miller v. City of Shaker Heights, Ohio, 438 F. Supp. 3d 829, 839 (N.D. Ohio 2020). "Indeed, most constitutional violations occur when officials abuse, overreach, or act outside their official authority." Id. "It is axiomatic that under 'color' of law means 'pretense' of law,' and not the authorized exercise of legal authority." Miller at 839 (quoting Monsky v. Moraghan, 127 F.3d 243, 245 (2nd Cir. 1997)). Further, "[i]t is the nature of the act performed, not the clothing of the actor or even the status of being on duty, or off duty, which determines whether the officer acted under color of state law." Stengel v. Belcher, 522 F.2d 438, 441 (6th Cir. 1975).

Additionally, the Sixth Circuit has held that an officer acts under color of law when he purports to exercise official authority. See Memphis, Tenn. Area Local, Am. Postal Workers Union v. City of Memphis, 361 F.3d 898, 903, 86 F. App'x 137, 141 (6th Cir. 2004). "Such manifestations of official authority include flashing a badge, identifying

---

[10] *Every person* who, *under color of any statute, ordinance, regulation, custom, or usage, of any State* or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

42 U.S.C. § 1983 (alteration in original) (emphasis added).

oneself as a police officer, placing an individual under arrest, or intervening in a dispute between third parties pursuant to a duty imposed by police department regulations." Id.

In the case at bar, Winters, a police officer with decades of experience, approached the Plaintiff after Mason directed him to remove the Plaintiff. Indeed, Mason called on who appears to be the only other law enforcement officer in the room that evening aside from the Sheriff. Plaintiff asked both Burnett and Winters if he was being removed under threat of arrest. Winters testified that Plaintiff had no choice but to leave. Both Burnett and Winters testified that multiple officers being present can increase the coercive effect on a person. Further, the policy of the Sheriff's office required Winters to act to preserve the peace.

The implication of the facts in this matter is Plaintiff was aware that law enforcement officers were removing him from the meeting under threat of arrest, and Winters acted while clothed under the color or law.

### Winters as private citizen.

Assuming *arguendo* that Winters was a private citizen during the events of the January 2024 meeting, his conduct in concert with Mason and the commission, and Burnett, still exposes him to liability.

> Private persons, jointly engaged with state officials in the prohibited action, are acting under color of law for purposes of the statute. To act under color of law does not require that the accused be an officer of the State. It is enough that he is a willful participant in joint activity with the State or its agents.

United States v. Price, 383 U.S. 787, 794 (1966). See also Dennis v. Sparks, 449 U.S. 24, 27–28, (1980) (Private persons, jointly engaged with state officials in the challenged action, are acting see "under color" of law for purposes of § 1983 actions); and Lugar v. Edmondson Oil Co., 457 U.S. 922, 933 (1982) ("private use of the challenged state

procedures with the help of state officials constitutes state action for purposes of the Fourteenth Amendment.")

A private party's actions constitute state action under section 1983 where those actions may be fairly attributable to the state. <u>Nugent v. Spectrum Juv. Just. Servs.</u>, 72 F.4th 135, 140 (6th Cir. 2023) (quoting, <u>Chapman v. Higbee Co.</u>, 319 F.3d 825, 833 (6th Cir. 2003) (en banc). There are three tests for determining whether a private actor may be treated as a state actor: "the public-function test, the state-compulsion test, and the nexus test." <u>Id.</u>

> The public function test requires that the private entity exercise powers which are traditionally exclusively reserved to the state. The state compulsion test requires proof that the state significantly encouraged or somehow coerced the private party, either overtly or covertly, to take a particular action so that the choice is really that of the state. Finally, the nexus test requires a sufficiently close relationship between the state and the private actor so that the action taken may be attributed to the state.

<u>Memphis, Tennessee Area Loc., Am. Postal Workers Union, AFL-CIO v. City of Memphis</u>, 361 F.3d 898, 905 (6th Cir. 2004) (internal citations omitted) (alteration in original).

Mason, with the quiet acquiesce of the commission, encouraged and even directed Winters and Burnette to operate together to remove the Plaintiff. Significantly, Mason called on (apparently) the only two law enforcement officers present[11] to remove the Plaintiff. Both Winters and Burnett stated they acted in response to Mason's directives when Burnett claimed he saw no reason to remove the Plaintiff. Additionally, the implication from Winters' testimony and Burnett's testimony is that they worked with

---

[11] Burnette testified that he attends the commission meetings but did not mention anyone else other than Winters. (Burnett Dep. at 8, and *per totum*). Winters testified no other officers were involved. (Winters Dep. at 69).

Mason and the commission to secure the end result (removal of the Plaintiff) while Mason became increasingly agitated with Plaintiff's criticism of Mason and the commission.

## MUNICIPAL LIABILITY THEORIES

The County bemoans that it is a defendant in the federal claims but gives little explanation as to why, other than its mixed bag of arguments. It seems that the County disclaims all responsibility for the misconduct Mason, Burnett, and Winters, and purports to base this theory on <u>Monell v. Department of Social Services of City of New York</u>, 436 U.S. 658 (1978); but the lens through which it views <u>Monell</u> is much too narrow. The County fails to realize that it can be liable for its actors' misconduct under a number of theories within the <u>Monell</u> framework.

A plaintiff raising a municipal liability claim under § 1983 must demonstrate that the alleged federal violation occurred because of a municipal policy or custom. <u>See Monell v. Dep't of Soc. Servs.</u>, 436 U.S. 658, 694 (1978).

> A plaintiff can make a showing of an illegal policy or custom by demonstrating one of the following: (1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations.

<u>Burgess v. Fischer</u>, 735 F.3d 462, 478 (6th Cir. 2013)

### Marion County Commission and Mason – Policy Maker and official with final decision-making authority- One time decision (ad hoc policy)

In certain circumstances, a single policymaker's or decisionmaker's actions can subject the County to municipal liability. <u>See Pembaur v. City of Cincinnati</u>, 475 U.S. 469, 480 (1986). In such a situation, "[m]unicipal liability attaches only where the

decisionmaker possesses final authority to establish municipal policy with respect to the action ordered ... Authority to make municipal policy may be granted directly by a legislative enactment or may be delegated by an official who possesses such authority." <u>Id.</u> at 481–83. A decisionmaker may also be found to possess final authority by virtue of "less formal sources of law such as local practice and custom." <u>Feliciano v. City of Cleveland</u>, 988 F.2d 649, 655 (6th Cir. 1993). Policy can also include one-time decision to take a course of action not intended to control decisions in later situations but is tailored to the situation presented to the authorized official. <u>See Pembaur</u>, at 481.

To determine whether a decisionmaker possesses such authority, the Court must look to state law. <u>See Jett v. Dallas Indep. Sch. Dist.</u>, 491 U.S. 701, 737 (1989). In Tennessee, county governments are established and regulated by TENN. CODE ANN. § 5-5-101, *et seq.* "The chair of the legislative body shall preside over the sessions of the legislative body." TENN. CODE ANN. § 5-5-103(c). Tennessee courts have held that rulemaking is legislative act, but rulemaking bodies "may not, however, promulgate rules that are so lacking in reason that they are patently arbitrary, unreasonable, or capricious." <u>See, e.g., Tennessee Cable Television Ass'n v. Tennessee Pub. Serv. Comm'n</u>, 844 S.W.2d 151, 168 (Tenn. Ct. App. 1992)

While Mason's deposition testimony indicates her attempt to shift the decision-making authority from herself to the commission as a whole regarding the commission meetings, she failed to recognize that she was the one in control of the meetings, and she was the one who was responsible for the direction of the meetings at issue. Mason's conduct described in this response reveals a person with no training or experience at holding a meeting beyond ensuring control of the meeting. Her utter lack of knowledge of

what the First Amendment meant to protect showed in her constant rude behavior manifested in her [a] insulting response to the Plaintiff, [b] her arbitrary orders for the Plaintiff to go to a mike while she did not do the same to others who did not criticize the commission, [c] her threats of calling the police (of whom her husband was the chief), [c] her use of Winters and the Sheriff to silence and remove the Plaintiff, [d] her failure to seek counsel of Gallagher, and [e] her failure to obtain consensus from the other commission members.

Plaintiff is not claiming that Mason acted pursuant to a policy by the commission. "When an official's discretionary decisions are constrained by policies not of that official's making, those policies, rather than the subordinate's departures from them, are the act of the municipality." St. Louis v. Praprotnik, 485 U.S. 112, 127 (1988). As stated *supra*, Plaintiff submits that the evidence shows Mason's conduct was of her arbitrary choice, *ad hoc* and ratified by the silent and tacit acquiescence of the entire commission and its attorney.

> [O]n a single-act theory, a plaintiff must demonstrate that a deliberate choice to follow a course of action is made from among various alternatives by the official ... responsible for establishing final policy with *respect to the subject matter in question*. Moreover, that course of action must be shown to be the moving force behind or cause of the plaintiffs harm

Burgess v. Fischer, 735 F.3d 462, 479 (6th Cir. 2013) (internal citations omitted) (alteration in original) (emphasis added).

In addition to the arguments in this section, Plaintiff points out that the commission had *zero* established policies regarding how meetings were to be conducted. Mason referenced Robert's Rules of Order but had near zero knowledge of what they were. Mason described a haphazard (at best) procedure that left open for her to wield her power

and authority like a child who just found her dad's gun. To be sure, the removals in the January 2024 meeting and the June 2024 meeting were based on Mason's rapid fire unilateral decisions, not on long-standing and well-established rules. The commission meeting protocols concerning public comment restrictions were informal, ambiguous, and inconsistently communicated prior to or during the relevant events, with rule changes coming only after the January 2024 incident.

### Marion County -the existence of a policy of inadequate training as the driving force behind the Plaintiff's damages.

Recently, the Sixth Circuit explained that prevailing on a failure to train or supervise claim requires a showing that "(1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." Howell v. NaphCare, Inc., 67 F.4th 302, 319 (6th Cir. 2023) (citation and internal quotation omitted). While the County implies that Plaintiff cannot show a pattern of similar misconduct and thus deliberate indifference, it ignores the other route to demonstrate deliberate indifference. As explained by the Sixth Circuit in Shadrick v. Hopkins Cnty., 805 F.3d 724 (6th Cir. 2015):

> Shadrick can demonstrate SHP's failure to provide LPN nurses with adequate training and supervision in one of two ways. She can show "[a] pattern of similar constitutional violations by untrained employes" and SHP's continued adherence to an approach that [it] knows or should know has failed to prevent tortious conduct by employees," thus establishing "the conscious disregard of the consequences of [its] action – the 'deliberate indifference'— necessary to trigger municipal liability." Alternatively, Shadrick can establish a single violation of federal rights, accompanied by a showing that [SHP] has failed to train its employees to *handle recurring situations presenting and obvious potential*" for a constitutional violation.

Id. at 738–739 (alterations original) (internal citation omitted) (emphasis added).

Beginning with <u>City of Canton v. Harris</u>, under certain circumstances, the obviousness for training alone could establish deliberate indifference. <u>See</u> 489 U.S. 378, 390 (1989). Since <u>Canton</u> was decided, this instruction has repeatedly been applied by the Sixth Circuit Court of Appeals.

For example, in <u>Ouza v. City of Dearborn Heights</u>, 969 F.3d 265 (6th Cir. 2020), the plaintiff alleged:

> [T]hat Dearborn Heights did not provide *any* training to its police officers regarding the use of excessive force and handcuffing procedures prior to her arrest. It also did not provide any training regarding probable cause determinations. Plaintiff further alleges that Dearborn Heights never conducts performance evaluations for its police officers and did not otherwise supervise or monitor its officers' conduct.

<u>Id.</u> at 286. (emphasis original).

Importantly, the <u>Ouza</u> plaintiff did not allege prior instances of misconduct to establish the municipality's deliberate indifference. <u>Id.</u> at 287–88. Despite this, the Sixth Circuit found that the failure to provide *any* training was constitutionally inadequate given the frequency these situations would arise. <u>Id.</u> at 289.

In the matter at bar, the County failed to provide the most basic training to Mason as to how she was to conduct the meetings, which are done on a frequent basis. Mason had limited, if any, knowledge of the Robert's Rules of Order[12]. Her knowledge was confined to "an agenda set forth," and the meetings "kept orderly." Mason was a "brand-new"

---

[12] Whether Mason actually knew about these rules or simply made this claim up is an issue for the jury to determine, since the jury is the final arbiter of credibility. <u>See</u> <u>Alspaugh v. McConnell</u>, 643 F.3d 162, 168 (6th Cir. 2011) ("when reviewing a summary judgment motion, credibility judgments and weighing of the evidence are prohibited.") (internal citation omitted).

commissioner and did not know how to conduct a meeting. If Mason had any questions, she would refer to Billy Gallagher, but at no time in the video recording of the incident did she consult with Gallagher or any member of the commission nor did she ask to hold a vote on the removal by the commission.

While Burnett stated that he had never seen anyone get removed from a meeting, his observation underscores the level of Mason's ignorance of her duties thus the need for some training. It is obvious to anyone that the frequency of the meetings could result in the events that happened here. Without the most rudimentary training, Mason was free to act arbitrarily and capriciously.

## DEFENDANTS' (INDIVIDUAL AND THE COUNTY) WAIVER OF DEFENSES ON ISSUES NOT PROPERLY RAISED OR BRIEFED. THE INDIVIDUAL DEFENDANTS' CLAIMS OF QUALIFIED IMMUNITY AND RIGHTS NOT CLEARLY DEFINED.

It appears that these individual defendants assert that there was no clearly established constitutional right simply because the commission meeting was a limited forum. (DE 39, PageID #: 165). This narrow view overlooks the hard facts, and that this Court is required to draw inferences from the facts in the light most favorable to the party opposing summary judgment. See Scott v. Harris, 550 U.S. 372, 378 (2007). In qualified immunity cases, this usually means adopting a plaintiff's version of the facts. See Id.

It is also unclear that the individual defendants' argument for qualified immunity is limited to the First Amendment (Free Speech) violations (Mason, DE 39, PageID #: 163-65), and the Fourth Amendment violations (Burnett and Winters, DE 39, PageID #: 165). The individual defendants did reference civil conspiracy to violate civil rights[13] in their

---

[13] DE 1, PageID #: 14-15.

motion (DE 38, PageID #: 142) but did not flesh out anything as to the conspiracy claim *nor did they assert or claim qualified immunity as to the civil conspiracy claim in their joint motion at all* (DE 38). The only time the Defendants discussed qualified immunity was in their brief and then abandoned any discussion of qualified immunity and the civil conspiracy claim. Defendants also failed to address Plaintiff's claims regarding right to petition government, due process, and the state claims under TENN. CODE ANN. § 8-8-302.

**The Individual Defendants waived qualified immunity or at least as to Count Two, Count Three, Count Six, and Count Ten of Plaintiff's Complaint. The County and the Individual Defendants have waived any opposition to Plaintiff's claims in Count Two, Count Three, Count Six, Count Ten. The County has waived any opposition to County Twelve (TENN. CODE ANN.§ 8-8-302).**

**Waiver of Qualified Immunity – In General.**

Case law confirms that district courts have discretion to disregard arguments that are not adequately developed, asserted, or properly briefed. The Sixth Circuit has consistently held that '[q]ualified immunity is an affirmative defense that must be pleaded and proved by the defendant." Summe v. Kenton Cty. Clerk's Office, 604 F.3d 257, 269 (6th Cir. 2010) (alteration in original). "The failure to raise qualified immunity results in waiver of the defense." Id. While raising qualified immunity in an answer preserves the defense initially, defendants must also assert it in their summary judgment motion to avoid waiver at that stage. See Id. at 269-70.[14] It is not the court's responsibility to craft

[14] The Summe Court acknowledged that the defendant raised qualified immunity in the answer but never raised it in his motion and it did not brief the issue. See Id. In case at bar, the individual defendants claimed to have plead qualified immunity in their Answer. (DE 39, PageID #: 163).

winning legal arguments for the parties. See Does v. Whitmer, 751 F. Supp. 3d 761, 811 (E.D. Mich. 2024).

In upholding a denial of summary judgment, the Sixth Circuit in Cockrun v. Berrien County, Michigan, 101 F.4th 416 (6th Cir. 2024), found the district court denied qualified immunity to the defendant officers because they merely mentioned the immunity in 3 places and did not address the elements of qualified immunity as they related to *each officers'* actions. See Cockrun, at 418-19.

In Elloit v. Lator, 497 F.3d 644 (6th Cir. 2007). The court considered the question whether a "mere assertion of a claim of qualified immunity, *without being raised by defendants in a motion for summary judgment or a motion to dismiss,* is enough to support appellate jurisdiction when that claim is denied by the district court." Elliot, 649 (emphasis in original). The court in dismissing the officer's interlocutory appeal, found: "In light of their utter failure to raise appropriate defenses or motions to dismiss as to the excessive force claim, the troopers undoubtedly will be going to trial on certain aspects of it." Elliot, at 652.

In the case at bar, the individual defendants failed to raise qualified immunity in their motion and failed to state in their motion with particularity why they are entitled to summary judgment on the issue of qualified immunity. See FED. R. CIV. P., Rule 7(b)(1)(B). While the individual defendants assert qualified immunity in their brief, they do not specifically address Count Three (right to petition government), and Count Four (deprivation of Due Process), nor do they provide a separate, detailed legal analysis specifically about the right to assemble, but assert qualified immunity as encompassed in their general analysis for speech at public meetings. (DE 39, PageID #: 151). The

individual defendants argue dismissal of Count Six (civil conspiracy) in their brief only through the lens of Rule 12(b)(6).[15] The individual defendants cannot raise new arguments in a reply. See Scottsdale Ins. Co. v. Flowers, 513 F.3d 546, 553 (6th Cir. 2008).

**Waiver of Remaining claims.**

"It is not the court's responsibility to craft winning legal arguments for" the parties. United States v. Mungarro, 2020 WL 1933816, at *3 (E.D. Mich. Apr. 22, 2020).

*Regarding the right to assemble and petition government*

The defendants explicitly reference "claims (speech and assembly)" in the context of the January 29, 2024 meeting and describe the alleged violations as "First Amendment claims (speech and assembly)" occurring during the public comments section of the commission meeting. (DE 39, PageID #: 151; DE 38, PageID #: 141 [general denial]). They argue that regulating the time, place, and manner of speech, including limiting comments to agenda topics, is not an unconstitutional infringement on the plaintiff's First Amendment rights, which—by their grouping—includes both speech and assembly. (DE 39, PageID #: 151). The Defendants do not provide a separate, detailed discussion or legal analysis specifically about the right to assemble, but treat it as encompassed by their general First Amendment analysis for speech at public meetings. (Id.). Thus, the Defendants have waived opposition to Plaintiff's claims in Count Two.

*Regarding right to petition -specifics*

Defendants' motion recognizes the existence of a right to petition claim as part of the Plaintiff's causes of action, but do not substantively or separately address the

---

[15] Plaintiff will address the Defendants' opposition to Count Six (civil conspiracy) in a separate section.

Plaintiff's claim for violation of the right to petition the government for redress of grievances. (DE 38). The motion does not provide any argument or authority specific to the right to petition, treating the First Amendment claims collectively and focusing arguments on free speech and assembly alone.

In their supporting Memorandum of Law, the Defendants again acknowledge in the factual and procedural background that the Plaintiff brings multiple First Amendment claims. (DE 39, PageID #: 144). However, in the section titled "Defendants are entitled to summary judgment on all First Amendment Claims," the legal analysis addresses the First Amendment only in terms of "speech and assembly." (Id. at 149-51). Throughout the argument, the Defendants focus exclusively on the regulatory limitations placed on speech during public comment periods, analyzing whether the Plaintiff's right to speak during public meetings was improperly curtailed. (Id. at 151-52). The memorandum employs terms like "free speech," "speech and assembly," and "First Amendment claims" interchangeably, but at no point does it specifically mention or analyze the right to petition the government for redress of grievances as a distinct constitutional right. Thus, the Defendants waived opposition to Count Three.

### *Regarding Due Process.*

The brief contains no section or argument explicitly addressing a due process claim or the Fourteenth Amendment as an independent basis for relief. The text does not reference "due process," "procedural due process," "Fourteenth Amendment" (except as a basis for First Amendment incorporation or in passing in reference to Monell), or any arguments analogizing or rebutting procedural or substantive due process rights. (DE 39,

PageID #: 144-46). No discussion of procedural fairness, notice, opportunity to be heard, or concepts inherent in due process appears in the arguments or facts sections.

There are several statements that the Plaintiff was limited in the subject matter he could discuss, and that any removal or limitation was related to adherence to meeting agenda policy, but these points are only discussed as related to free speech/First Amendment and not as due process deprivation. (DE 39, PageID ##: 144-46, 151-53). The Monell section references constitutional violations generally but provides no due process-specific analysis or argument. (DE 39, PageID ##: 165-67). Throughout, the summary judgment arguments are factually and legally targeted at the other claims, with no direct or indirect argument concerning due process. (DE 39, PageID ##: 144-46). The conclusion and prayer for relief also do not reference due process or the Fourteenth Amendment, except in summary passages referring to "constitutional claims" as a group. (DE 39, PageID ##: 167-68).

The Motion for Summary Judgment (DE 38) explicitly lists the Plaintiff's claim for "deprivation of due process in violation of the Fourteen Amendment at the January 29, 2024 commission meeting" as one of the asserted causes of action in outlining the claims brought by plaintiff. (DE 38, PageID #: 141). However, while the motion details specific arguments about the First Amendment, Fourth Amendment, state law claims, and general entitlement to summary judgment "as to all counts," it does not address the Fourteenth Amendment or due process claims in any meaningful way within the substantive argument or summary judgment basis. (DE 38). There are no arguments, statements, or references discussing why summary judgment should be granted as to the Fourteenth Amendment claim specifically, nor are there discussions of the due process

standards or factual application to that claim. Defendants waived opposition to Count Four.

### *Regarding TENN. CODE ANN. § 8-8-302.*

In the motion for summary judgment itself (DE 38), the defendants identify and enumerate plaintiff's causes of action, including explicit acknowledgment that plaintiff has pursued "a state law claim under Tenn. Code Ann. § 8-8-302." (DE 38, PageID #: 141). However, beyond this reference in the list of causes of action, the motion contains no discussion or analysis of this claim. The arguments that follow the enumeration concern the constitutional and tort claims exclusively and do not revisit, analyze, or request specific relief (summary judgment or dismissal) regarding the TENN. CODE ANN. § 8-8-302 claim. There is no section or passage in the motion that addresses the elements or viability of a claim under that statute, nor any arguments for its dismissal.

The brief suffers from the same infirmity as the motion. A review of the entirety of the Defendants' memorandum of law in support of their motion for summary judgment (or alternatively, to dismiss), reveals no discussion—either explicit or implicit—of Plaintiff's claims under TENN. CODE ANN. § 8-8-302. The brief does not contain any reference to TENN. CODE ANN. § 8-8-302 by name, number, or paraphrase. There is also no section addressing or analyzing the elements, applicability, or defenses arising under this statute, nor is there any reference to any state-law basis for county liability for actions of sheriff's deputies.

The Defendants' arguments in their brief focus primarily and extensively on the federal constitutional claims (First Amendment, Fourth Amendment, civil conspiracy, Monell liability), as well as common law torts (assault, battery, and intentional infliction

of emotional distress). The only mention of state law claims is with respect to the common law torts; at no point do defendants acknowledge or discuss plaintiff's claim under TENN. CODE ANN. § 8-8-302. This opposition is waived as to Count Twelve.

### The Individual Defendants' claim that the rights at issue before the Court are not clearly defined.

Given the testimony of the individual defendants are in stark contrast to the video evidence in this case, it is predictable that they do not fully brief the law on qualified immunity and clearly defined rights. Thus, Plaintiff will review in detail the law applicable in this matter. Plaintiff will then address the law that applies to the claims in this matter (i.e.: First and Fourth Amendments).

A qualified immunity defense boils down to the question of whether the individual defendants "violated a 'clearly established' right." Camreta v. Greene, 131 S.Ct. 2020, 2031 (2011) (citing Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). The first prong of qualified immunity is whether "the official violated a statutory or constitutional right" (in this case, the right to be free from unlawful seizure and deprivation of rights under the First Amendment); and the second prong is whether "the right was 'clearly established' at the time of the challenged conduct." Ashcroft v. Al-Kidd, 131 S. Ct. 2074, 2080 (2011). The Court need not address these two elements in any particular order. Id. (quoting Pearson v. Callahan, 555 U.S. 223, 236-37 (2009)). A case directly on point is not required for the law to be clearly established. See Id., at 2083. However, "existing precedent must have placed the statutory or constitutional question beyond debate." Id.

Defendants are placed on notice by case law in effect at the time. See Campbell v. City of Springfield, Ohio, 700 F.3d 779, 788 (6th Cir. 2012). Defendants can still be on notice that their conduct violates established law e*ven in novel factual circumstances*, and a fundamentally similar or materially similar case is not required to show it is clearly established. See Hope v. Pelzer, 536 U.S. 730, 741 (2002). See also Baynes v. Cleland, 799 F.3d 600, 613 (6th Cir. 2015) (a requirement that a prior case be "fundamentally" or "materially" similar to the present case would be too rigid an application of the clearly established inquiry.)

In other words, the "mere fact that a court has not held the particular action in question unlawful is insufficient to create immunity." Martin, at 961 (citing several cases). Stated another way, the courts "have to zoom in close enough to ensure the right is appropriately defined"— "[b]ut not too close." Martin at 960.[16]

### Constitutional Violation – Plaintiff's rights under the First Amendment of the United States Constitution.

Deprivation of Plaintiff's Freedom of Speech – January 29, 2024

Discrimination against speech because of its message is presumed to be unconstitutional. See Turner Broadcasting System, Inc. v. FCC, 512 U.S. 622, 641–643,

---

[16] Precedent demands instead that we go down the stairs of abstraction to a concrete, particularized description of the right. Though not too far down: just as a court can generalize too much, it can generalize too little. If it defeats the qualified-immunity analysis to define the right too broadly (as the right to be free of excessive force), it defeats the purpose of § 1983 to define the right too narrowly (as the right to be free of needless assaults by left-handed police officers during Tuesday siestas).

Hagans v. Franklin Cty. Sheriff's Office, 695 F.3d 505, 508-09 (6th Cir. 2012)

(1994). When the government targets not subject matter, but particular views taken by

speakers on a subject, the violation of the First Amendment is all the more blatant. See

R.A.V. v. St. Paul, 505 U.S. 377, 391 (1992). "Viewpoint discrimination is thus an

egregious form of content discrimination." Rosenberger v. Rector & Visitors of Univ. of

Virginia, 515 U.S. 819, 828–29 (1995). Both content- and viewpoint-based discrimination

are subject to strict scrutiny. See Bible Believers v. Wayne Cnty., Mich., 805 F.3d 228, 248

(6th Cir. 2015)

> The necessities of confining a forum to the limited and legitimate purposes
> for which it was created may justify the State in reserving it for certain
> groups or for the discussion of certain topics. Once it has opened a limited
> forum, however, the State must respect the lawful boundaries it has itself set.
> The State may not exclude speech where its distinction is not "reasonable in
> light of the purpose served by the forum," nor may it discriminate against
> speech on the basis of its viewpoint.

Rosenberger, at 829. See also Am. Freedom Def. Initiative v. Suburban Mobility Auth.,
978 F.3d 481, 499 (6th Cir. 2020)("If there is a bedrock principle underlying the First
Amendment, it is that the government may not prohibit the expression of an idea simply
because society finds the idea itself offensive or disagreeable.").

"Reasonable time, place, and manner restrictions are allowed but any restriction based on

the content of the speech must satisfy strict scrutiny, that is, the restriction must be

narrowly tailored to serve a compelling government interest." Pleasant Grove City, Utah

v. Summum, 555 U.S. 460, 469 (2009) (internal citations omitted).

The Defendants rely heavily on Youkhanna v. City of Sterling Heights, 934 F.3d

508, 519 (6th Cir. 2019) for the proposition that the forum, a county commission meeting,

is a limited forum that was subject to "reasonable restrictions." (DE 39, PageID #: 151-52).

However, Mason's conduct with the alliance of Burnett and Winters was anything but

reasonable. Mason arbitrarily flexed her chairperson muscles to limit Plaintiff when the

topic was one that she did not like, like making Plaintiff go to a podium in contrast to others she allowed to speak away from the podium.

While the County and Mason may claim that there was a time limit, despite the lack of any clear policy, Mason's continued rapid-fire interruptions of the Plaintiff inherently limited any averred time limit (that was NOT clearly established) for public comments. Despite the lack of any clear rules other than the dubious claims of following the Robert's Rules of Order (that Mason was painfully ignorant of) are belied by her behavior ("I've never followed rules. I'm opinionated."). The County and Mason's claims are further belied by the limits Mason imposed that included arbitrary and sometimes selective time limits even *with agenda matters*, the requirement to use the microphone, and nontransparent or inconsistently applied procedures for public comment. Additionally, and uniquely, Plaintiff's removal at the hands of the only two law enforcement officers present while no one from the commission or the commission attorney sat silent further contradicts the claims by the County and Mason.

Moreover, Mason's use of the only two police officers present to remove Plaintiff and Leonard reveal Mason's anger directed toward Plaintiff for his challenge to the commission, and of Leonard when Leonard made comments Mason did not like. Mason did this mere *seconds* after instigating an argument with Plaintiff. While Mason claimed that Plaintiff was talking "off topic," he did attempt to speak about Pull Tight Road and Brow Trail Road, matters that were on the agenda for January 2024 meeting. Finally, a jury can easily determine that Mason's arbitrary use of "topics" (along with her conduct as a while) was a means to restrict Plaintiff's viewpoints. Indeed, a jury can infer from Mason's conduct she intended to discriminate against Plaintiff because of his viewpoint comments,

and the same jury especially in light of Winters' acknowledgement that Plaintiff's rights were violated.

<div align="center"><u>Deprivation of Plaintiff's Freedom of Speech – June 24, 2024</u><br><u>Retaliation</u></div>

Plaintiff incorporates the arguments in the immediate previous discussion, *supra*.

Retaliation claims are evaluated under a burden-shifting framework that requires Plaintiff to establish a prima facie case that he (1) engaged in protected speech, (2) suffered adverse governmental action, and (3) the adverse action was motivated at least in part by the protected speech. <u>See Dye v. Off. of the Racing Comm'n</u>, 702 F.3d 286, 294 (6th Cir. 2012) (quoting <u>Scarbrough v. Morgan Cnty. Bd. of Educ.</u>, 470 F.3d 250, 255 (6th Cir. 2006)). Once Plaintiff makes that case, the burden shifts to the Defendants to prove that the adverse action would have occurred regardless of the Plaintiff's speech. <u>See Id.</u> A court grants summary judgment if "no reasonable juror could fail to return a verdict for the defendant." <u>Id.</u> (quoting <u>Eckerman v. Tenn. Dep't of Safety</u>, 636 F.3d 202, 208 (6th Cir. 2010)).

First, Plaintiff's speech (he was on the agenda) contained criticism of the commission, which is protected speech. <u>See New York Times Co. v. Sullivan</u>, 376 U.S. 254, 270 (1964) (speech may include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials). Next, Mason threatened Plaintiff with police action. In <u>Hansen v. Westerville City School District Board of Education</u>, the Sixth Circuit directly addressed this issue, holding that "a threat to call the police made for the purpose of dissuading [someone] from expressing [their] views could have had a chilling effect on the exercise of [their] First Amendment rights." <u>Hansen v. Westerville City Sch. Dist. Bd.</u>

of Educ., 1994 U.S. App. LEXIS 31376, at *27 (6th Cir. Nov. 7, 1994)[17]. The Hansen court emphasized that "where one is threatened with arrest or prosecution for exercising his right to expression, thereby chilling the exercise of that right, a constitutional violation may occur even without an arrest or prosecution." Id. at *29. Finally, the implication of Mason's outreach to the "police department," which her husband was chief of police, is Mason was motivated by Plaintiff's speech.

### Constitutional Violation- Fourth Amendment.

"Fourth Amendment jurisprudence suggests a person is seized ... when a reasonable person would not feel free to remain somewhere, by virtue of some official action." Couzens v. City of Forest Park, Ohio, 114 F.4th 571, 578 (6th Cir. 2024) "Examples of circumstances that might indicate a seizure ... would be the threatening presence of several officers, the display of a weapon by an officer, *some physical touching of the person of the citizen*, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." Id. In Couzens, the court found that the off-duty officers seized plaintiff when they directed him to leave the property without touching him. Id.

The Defendants in this matter are entitled to qualified immunity if their conduct was objectively reasonable. See Id. Winters acknowledged to Plaintiff that he had a right to address the commission. Burnett stated he did not see any reason to remove the Plaintiff, and Winters acknowledged nearly the same. Like the matter in Couzens,

---

[17] The entire opinion is submitted as an exhibit pursuant to Sixth Circuit Rule 24.

Burnett and Winters directed Plaintiff to leave and are not entitled qualified immunity since their seizure of the Plaintiff was without probable cause and thus unreasonable.

## Constitutional Violation- Civil Conspiracy.[18]

A civil conspiracy is an agreement between two or more persons to injure another by unlawful action. See Bazzi v. City of Dearborn, 658 F.3d 598, 602 (6th Cir. 2011). To prevail on a § 1983 civil conspiracy claim, a plaintiff must show that (1) a single plan existed, (2) the alleged coconspirator shared in the general conspiratorial objective, and (3) an overt act was committed in furtherance of the conspiracy that caused injury to the plaintiff. See Id. Vague and conclusory allegations unsupported by material facts are insufficient to state a claim. See Id. "Rarely in a conspiracy case will there be direct evidence of an express agreement among all the conspirators to conspire [; thus,] circumstantial evidence may provide adequate proof of conspiracy." Weberg v. Franks, 229 F.3d 514, 528 (6th Cir.2000). A tacit or mutual understanding between the parties is enough to prove a conspiratorial agreement. See Crawford v. Geiger, 996 F. Supp. 2d 603, 618 (N.D. Ohio 2014) (citing, United States v. Barger, 931 F.2d 359, 369 n. 6 (6th Cir.1991)).

Burnett and Winters acted in response to and in concert with Mason when she directed them to remove Plaintiff. (DE 1, PageID #: 6-7). Rather than decline Mason's request, Burnett and Winters approached Plaintiff, placed their hands on him, and removed Plaintiff from the meeting. (Id. at 7).

---

[18] As Plaintiff pointed out, the Defendants seek dismissal under FED. R. CIV. P., Rule 12(b)(6).

As to the facts developed in response to summary judgment, Burnett and Winters acknowledged Mason engaged them in her conduct, the end result being suppression of the Plaintiff's right to speak, and by implication assemble and petition the commission about Plaintiff's issues with Pull Tight Road. Burnett and Winters acknowledged that there was no basis to remove Plaintiff other than to satisfy Mason. The commission as a whole remained silent during the entire incident.

Defendants have stated no case on point to support their claim that a conspiracy cannot develop in a short time. (DE 39, PageID #: 163). The case law only requires an agreement between the defendants. The Defendant's assertions ignore the meaning of "tacit" understanding. For example, one conspirator can simply nod to another when they see something they want to steal and then take the item.

## PLAINTIFF'S CAUSES OF ACTION UNDER STATE LAW.

### Plaintiff's Assault and Battery Claims.

If a defendant intends to create an apprehension of harm in the plaintiff, he or she has committed the intentional tort of assault. See Hughes v. Metro. Gov't of Nashville & Davidson Cnty., 340 S.W.3d 352, 371 (Tenn. 2011). The Hughes Court drew upon the definition of assault in the criminal statute of Tennessee. See Id. The elements of criminal assault are the same in civil assault claims. See Id. A person commits assault who intentionally causes another to reasonably fear imminent bodily injury or causes physical contact with another to who would reasonably regard the contact as extremely offensive of provocative. See TENN. CODE ANN. § 39-13-101(a)(2), and (3).

"A battery necessarily requires an *unpermitted touching* of the plaintiff by the defendant or by some object set in motion by the defendant." Brown v. Christian Bros.

Univ., 428 S.W.3d 38, 57 (Tenn. Ct. App. 2013) (emphasis added). See also Doe v. Mama Taori's Premium Pizza, *LLC*, 2001 Tenn. App. LEXIS 224, 2001 WL 327906, at *4 (Tenn. Ct. App. Apr. 5, 2001) (battery intentional act that causes an unpermitted, harmful or offensive bodily contact).

Defendants downplay their coordinated efforts as "light touching" with no intent to cause harm. The facts say otherwise. Plaintiff was fearful of arrest, and Burnett and Winters testified that their joint efforts were a level of force designed to coerce the Plaintiff to leave the meeting and the building. These Defendants rely on Smythe for the proposition that a "proprietor" had the right to expel or restrain a "person who engages in abusive conduct and refuses to leave." (DE 39, PageID #: 154). However, this is a jury question. Burnette and Winters admitted that Mason was the instigator, and that they as police saw no law enforcement reason to remove the Plaintiff. The video of the January 2024 incident reveals Mason engaged in abusive conduct.

### Plaintiff's IIED Claim.

"The elements of an intentional infliction of emotional distress claim are that the defendant's conduct was (1) intentional or reckless, (2) so outrageous that it is not tolerated by civilized society, and (3) resulted in serious mental injury to the plaintiff." Rogers v. Louisville Land Co., 367 S.W.3d 196, 205 (Tenn. 2012). A party need not specifically allege *reckless* infliction of emotional distress and recovery is allowed when the defendant's conduct was not intended to cause emotional damage, only that the defendant was reckless in doing so. See Akers v. Prime Succession of Tenn., Inc., 387 S.W.3d 495, 502-03 (Tenn. 2012). Expert proof is not generally required to establish the claim.

Miller v. Willbanks, 8 S.W.3d 607, 616 (Tenn. 1999). The kinds of emotional distress that may be remedied include "fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, worry, and nausea." Miller, at 616 (quoting, Restatement (Second) of Torts § 46 cmt. j (1965)).

The outrageousness of the individual defendants' is a jury question where officials suppress speech and involve the police. To be sure, Burnette and Winters acknowledged that they had no independent basis to seize, humiliate, and remove the Plaintiff in front of numerous people on a live feed video. Plaintiff testified about the impact on his sleep, his anxiety and fear of Marion County police, and the nightmares he suffered.

**Note on presumed damages for First Amendment claims and Due Process.**

The Supreme Court has long recognized that certain constitutional rights can be vindicated through nominal damages without requiring proof of actual injury. In Carey v. Piphus, the Court held that "common-law courts traditionally have vindicated deprivations of certain 'absolute' rights that are not shown to have caused actual injury through the award of a nominal sum of money." Carey v. Piphus, 435 U.S. 246, 266 (1978). The Court explained that "by making the deprivation of such rights actionable for nominal damages without proof of actual injury, the law recognizes the importance to organized society that those rights be scrupulously observed." Id. General damages are presumed to occur when First Amendment rights are violated, and a plaintiff need not establish lasting or severe injury in this context. See Parrish v. Johnson, 800 F.2d 600, 606–07 (6th Cir. 1986).

Defendants imply during their discussion as to Plaintiff's claims that he has no damages, and thus the matter be dismissed. As noted, Plaintiff can prevail on nominal damages and does not need to show long lasting impact.

## CONCLUSION

The videos of the two events are the best evidence that radically contradicts the Defendants' assertions to the contrary. The Defendants waived opposition by failing to address several of Plaintiff's causes of action. This Court must deny the Defendants' motion.

Respectfully submitted,

By: /s/ *Robin Ruben Flores*

**ROBIN RUBEN FLORES**
**TENN. BPR #20751**
**GA. STATE BAR #200745**
Counsel for Plaintiff
4110-A Brainerd Road
Chattanooga, TN 37411
423 / 267-1575 fax 267-2703
robin@robinfloreslaw.com

CERTIFICATE OF SERVICE

I certify that I have delivered a copy of this response to all persons noted on the electronic filing receipt and so delivered on the date and time shown on the same receipt.

By: /s/ Robin Ruben Flores